Randolph Roy LaBAUVE et al.

v.

LOUISIANA WILDLIFE AND FISHERIES COMMISSION.

Edward Allen MARTIN et al.

v.

J. Burton ANGELLE et al.

Civ. A. Nos. 75–158 and 76–847.

United States District Court, E. D. Louisiana.

Jan. 5, 1978.

Joseph Neves Marcal, III, New Orleans, La., for plaintiffs.

Peter E. Duffy, Metairie, La., for defendants.

Before AINSWORTH, Circuit Judge, HEEBE, Chief District Judge, and SEAR, District Judge.

HEEBE, Chief District Judge:

Plaintiffs are two commercial fishermen in Louisiana who have brought this action both individually and on behalf of the class of commercial fishermen for damages as well as declaratory and injunctive relief against the enforcement of LSA–R.S. 56:314, 409 and 495.[1] More particularly,

---

1. This footnote sets forth the language of sections 314 and 409. Section 495, because of its length and the attached maps, is set forth in the Appendix.

LSA R.S. 56:314 appears in its entirety in West's Louisiana Statutes Annotated as follows:

**§ 314. Confiscation of unlawful tackle**

Possession or operation on the fishing grounds of illegal, unlicensed, or improperly tagged tackle is prima facie evidence that it is being used unlawfully or kept for unlawful use. Such tackle, used in operation thereof, is a public nuisance and shall be confiscated and turned over to the commission.

If the property so seized is susceptible of lawful use it shall be returned by the commission to its lawful owner within thirty days after final disposition of the charge. If the seized property is illegal per se and not susceptible of lawful use the commission shall make disposition in accordance with the order of the court having jurisdiction over the charge; provided however, that no fishing tackle, gear, rods or reels shall be seized by any agent of the commission if the sole violation is the failure of the offender to have on his person a fishing license.

LSA R.S. 56:409 appears in its entirety in West's Louisiana Statutes Annotated as follows:

**§ 409. Use of gill nets, trammel nets and seines in portions of Terrebonne and Lafourche Parishes**

A. The use of gill nets is hereby prohibited in the area bounded on the north by the southern line of the Intracoastal Waterway, on the south 750 feet seaward from the inside and outside shrimp line described in R.S. 56:495, on the east by the eastern boundary line of the parish of Lafourche and on the west by the western boundary line of the parish of Terrebonne. Any such nets found in use in the area described above shall be confiscated and destroyed.

B. Except for the period from July 16 through April 14 following, the use of tram-

plaintiffs contend (1) that the penalties set forth under sections 314 and 409 conflict, violating the fair notice requirements of Due Process of Law under the Fourteenth Amendment to the United States Constitution, (2) that the statutory provisions are vague insofar as they rely on the "inside and outside line" set forth in section 495 and hence violate due process requirements of fair notice, and (3) that section 409 favors sport fishermen over commercial fishermen in violation of the plaintiffs' rights to equal protection of the laws under the Fourteenth Amendment to the United States Constitution. The two named defendants in the original complaint are the Louisiana Wildlife and Fisheries Commission and the State of Louisiana. Jurisdiction is alleged under 28 U.S.C. §§ 1331, 1343(3), 2201 & 2202 and 42 U.S.C. §§ 1981, 1983, 1985 & 1988. Because the complaint seeks an injunction against the enforcement of a state statute, a three-judge court was requested and convened, pursuant to 28 U.S.C. §§ 2281, 2284.

The case is before us on a motion for preliminary injunction against the enforcement of these provisions by the Louisiana Wildlife and Fisheries Commission through its agents and employees. After a hearing in open court on a previous day and in light of the memoranda of law and fact submitted by the parties, the court is ready to rule. For the reasons set forth below, we abstain from deciding the motion of plaintiff Randolph Roy LaBauve and deny the motion of plaintiff Roy Prospere.

## REASONS

## I. ABSTENTION DOCTRINE

Because some evidence of state prosecutions of one or more plaintiffs during the pendency of this federal litigation was presented at the hearing on the preliminary injunction, the Court's first inquiry is whether it should abstain from making a determination in this case pursuant to the principles of *Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1970). For the following reasons, our answer is negative as to plaintiff Prospere but affirmative as to plaintiff LaBauve."

While no state prosecution against the named plaintiffs was pending at the time the instant suit was filed, the testimony of one of the plaintiffs, Randolph Roy LaBauve, was that as recently as June and July of 1976 he was arrested for alleged violation of the challenged fishing laws and on one occasion his nets were seized pursuant to section 409.

The question which we confront under the abstention doctrine is whether this ". . . federal litigation was in an embryonic stage and no contested matter had been decided" at the time plaintiff LaBauve engaged in the conduct for which the arrests were made. *Doran v. Salem Inn, Inc.*, 422 U.S. 922, 929, 95 S.Ct. 2561, 2566, 45 L.Ed.2d 648 (1974). In *Doran*, one of three plaintiff corporations, which filed a complaint on August 9, 1973, challenging the constitutionality of an ordinance prohibiting topless dancing and which had complied with the ordinance through the date of filing the complaint, proceeded on August 10, 1973, (one day after filing) to violate said ordinance. On August 9, the temporary restraining order sought by plaintiffs had been denied instanter, but the plaintiffs' motion for a preliminary injunction was set for hearing on August 22, 1973.

---

mel nets and seines for saltwater fishing is hereby prohibited in the area bounded on the north by the southern line of the Intracoastal Waterway, on the south 750 feet seaward from the inside and outside shrimp line described in R.S. 56:495, on the east by the eastern boundary line of the parish of Lafourche and on the west by the western boundary line of the parish of Terrebonne. It is specifically provided in this section that menhaden vessels licensed by the State of Louisiana shall be allowed to purse seine for menhaden seaward but not nearer than 750 feet seaward from the inside and outside shrimp line described in R.S. 56:495.

C. Any person found guilty of violating any provision hereof shall be subject to a fine of not less than two hundred dollars or more than five hundred dollars or imprisonment of not less than thirty days or more than six months. As an additional penalty, the violator's net or nets and catch shall be confiscated.

*Supra* at 924–925, 95 S.Ct. 2561. The Supreme Court held that *Younger v. Harris, supra,* mandated abstention by the federal court on the preliminary injunction motion of the corporation which commenced its violation one day after the denial of the temporary restraining order and filing of the complaint because the corporation which chose to violate the ordinance and subject itself to state prosecution ". . . rather than awaiting the normal development of its federal lawsuit . . . cannot now be heard to complain that its constitutional contentions are being resolved in a state court." *Doran v. Salem Inn, Inc.,* 422 U.S. 922, 929, 95 S.Ct. 2561, 2567, 45 L.Ed. 648 (1974). The court also stated:

> "When the criminal summonses issued against [the violator corporation] on the days immediately following the filing of the federal complaint, the federal litigation was in an embryonic stage and no contested matter had been decided. In this posture, [the violator corporation's] prayer for injunction is squarely governed by *Younger.*" *Id.*

■ In light of the fact that this suit was filed on May 23, 1975, whereas the state criminal proceedings did not occur until June and July of 1976, this suit was hardly embryonic from the perspective of time actually elapsed when the criminal proceedings began. On the other hand, this litigation was in an embryonic stage to the extent that the only significant development in the record from the filing date through July 14, 1976, was the denial of the plaintiffs' motion for temporary restraining or-

der on May 30, 1975. According to *Doran,* mere denial of a temporary restraining order left this case in the posture that "no contested matter had been decided" when plaintiff LaBauve engaged in conduct for which he was arrested on July 13, 1976. Plaintiff LaBauve, like the violating corporation in *Doran,* chose to engage in conduct subjecting himself to state prosecution rather than await the normal development of his federal lawsuit and hence *Doran* mandates abstention by this Court from deciding plaintiff LaBauve's motion for preliminary injunction pending determination of the pending state prosecution.

On the other hand, we do not have before us any evidence that plaintiff Roy Prospere was subject to state prosecution either at the time of filing this lawsuit or subsequent thereto. Mr. Prospere therefore falls into a category like the nonviolating corporations in *Doran* (i. e., the two corporations not subject to state prosecution) who were found entitled to pursue their motion for preliminary injunctive relief in federal court without being subject to *Younger's* restrictions. *Id.* at 930, 95 S.Ct. 2561.[2] Accordingly, we find no *Younger* basis for abstaining from determination of Mr. Prospere's claim.

Nor does there appear to be any basis, for a *Pullman*-type abstention. *Railroad Comm'n v. Pullman Co.,* 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1940). Abstention was appropriate in the case of *Dardar v. Louisiana Wildlife and Fisheries Comm'n,* 413 F.Supp. 937, 941 (E.D.La.1975), which sets forth the major factors to be con-

---

**2.** Like the nonviolating corporations in *Doran,* Mr. Prospere is represented by common counsel and has similar business activities and problems as plaintiff LaBauve, but the record in this case shows no evidence that he is unrelated to plaintiff LaBauve in terms of ownership, control and management, and thus he deserves to be treated independently. *Id.* at 928–929, 95 S.Ct. 2561. However, some suggestion that the relationship between plaintiffs LaBauve and Prospere may be significantly more intertwined than appears from the record in the instant case is present in *LaBauve v. Louisiana Wildlife and Fisheries Commission,* 289 So.2d 150 (La.1974) which states at p. 150:

> "Randolph Roy LaBauve and Roy Prospere are commercial fishermen. They live in Cocodrie settlement of Terrebonne Parish and earn their livelihood by trawling for fish and shrimp in the waters of Terrebonne Parish. Prospere possesses a license from the State of Louisiana allowing him to trawl with a 'gill net,' while LaBauve works with Prospere under the authority of the latter's license. Their investment in a boat, nets and equipment is estimated at $14,000."

We have no evidence that this relationship remained the same from 1974 through 1976 and proceed on the assumption that it did not. Compare *Hicks v. Miranda,* 422 U.S. 332, 348–349, 95 S.Ct. 2281, 45 L.Ed.2d 223 (1974).

sidered under *Pullman,* namely, whether the issue of state law is unclear and whether a decision by the state court would substantially modify or eliminate the federal constitutional question. *Also, see Dubois v. State of Louisiana,* 339 F.Supp. 685, 689–690 (E.D.La.1972). In *Dardar,* the Louisiana statute regulating the kind and size of shrimp nets allowed in Louisiana waters was challenged for vagueness. A criminal prosecution in that case would clearly establish whether the types of nets used by those plaintiffs were or were not proscribed. The uncertainty as to the scope of the statute's application would be cured by a state proceeding thus rendering unnecessary the determination of the federal vagueness challenge. Accordingly, the *Dardar* court correctly abstained.

While the instant case is like *Dardar* inasmuch as the errors in coordinates describing the "inside and outside line" in section 495 could be eliminated in a state proceeding, the instant case is significantly distinguishable from *Dardar* in that the decision of federal challenges based on (1) the alleged vagueness resulting from conflicting penalties, (2) the alleged vagueness due to the lack of artificial markers for the inside-outside line, and (3) the alleged invidious discrimination inherent in the challenged statutory provisions, will not be rendered unnecessary or modified by a state criminal proceeding. Thus, we conclude that *Pullman*-type abstention is not appropriate here.

Since neither *Younger* nor *Pullman* principles dictate abstention as regards plaintiff Prospere, we proceeded with the determination of whether the preliminary injunctive relief sought by him should be granted or denied.

## II. PRELIMINARY INJUNCTION CRITERIA

In determining whether a preliminary injunction should issue, we are obliged to lend an ear to a quartet of factors:

(1) whether there is a substantial likelihood that plaintiff will succeed on the merits;

(2) whether there is a substantial threat that the plaintiff will suffer irreparable harm unless the preliminary injunction is granted;

(3) whether the threatened injury to the plaintiff if the injunctive relief is denied outweighs the possible harm to the defendant if the relief is granted; and

(4) whether the issuance of injunctive relief will serve the public interest.

*Barrett v. Roberts,* 551 F.2d 662 (5th Cir. 1977); *Canal Authority v. Callaway,* 489 F.2d 567 (5th Cir. 1974); *Blackshear Residence Organization v. Romney,* 472 F.2d 1197 (5th Cir. 1973); *Allison v. Froehlke,* 470 F.2d 1123 (5th Cir. 1972).

## III. LIKELIHOOD OF SUCCESS ON THE MERITS

In our deliberations on the plaintiff's likelihood of success on the merits, we are guided by the precept that every statute is presumed to be constitutional and the court is bound to uphold the constitutionality of a statute when it is reasonably possible to do so. *Sevin v. Louisiana Wildlife and Fisheries Comm'n,* 283 So.2d 690, 694 (La.1973); *State v. Brown,* 288 So.2d 339 (La.1974). The burden is upon the party claiming the unconstitutionality to show that the classification of the statute has no rational basis. *State v. Devall,* 302 So.2d 909, 911 (La.1974).

### A. Due Process Challenges

In assessing plaintiff's likelihood of succeeding in his due process challenges, we proceed by first determining the nature of the interests involved (here alleged interests in property and liberty), and second, if the interests are of such nature as to deserve due process protection, determining that the procedures provided for protecting those interests are reasonable and fair under the circumstances. *Henry Smith v. Organization of Foster Families,* 431 U.S. 816, 838, 846, 97 S.Ct. 2094, 53 L.Ed.2d 14 (1977).

### 1. The Nature of Plaintiff's Interest

In considering the nature of the plaintiff's interest, we note that plaintiff Roy

Prospere is a commercial fisherman, licensed by the State of Louisiana to trawl with a "gill net." His investment in a boat, nets and equipment is estimated at $14,000. *LaBauve v. Louisiana Wildlife and Fisheries Commission,* 289 So.2d 150 (La.1974).

Plaintiff challenges the statutory restriction on the use of his equipment, claiming that it constitutes an invasion of his property rights by making his investment in boats and nets less valuable as well as a deprivation of his liberty-property right to pursue the commercial fishing occupation and earn a livelihood.

The Louisiana Supreme Court has expressly held that fish which are at large in state waters are the property of the state, as public or common things under LSA Civ. Code Art. 453 and 450, and that an individual has no proprietary interest in the fish he is prevented from catching. 289 So.2d 150, 152–153. That court has further held that an individual has no proprietary right to fish commercially in state waters. *Banjavich v. Louisiana License Board for Marine Divers,* 237 La. 467, 111 So.2d 505 (1959). However, the state may grant an individual the privilege of catching and disposing of fish, under such regulations as the state may impose and subject to such state interferences with the exercise of the privilege as are warranted by the state's exercise of its police power. *Alfred Oliver & Co. v. Board of Commissioners,* 169 La. 438, 125 So. 441 (1929).

The *LaBauve* decision in effect holds that a licensed commercial fisherman (1) has no proprietary interest in wild fish or in fish which state regulation prevents him from catching, (2) has no proprietary right in exercising his fishing license but merely has a state-granted privilege subject to such limitations as the state may impose in the exercise of its police power, and (3) has a proprietary interest in the use of his boats and nets which is subject to restriction by the state pursuant to its power to regulate the taking of fish in public waters (including, for instance, restriction of the areas in which particular types of equipment can be used). *LaBauve v. Louisiana Wildlife and Fisheries Comm'n, supra* at 153.

While the Louisiana Supreme Court's articulation of property and liberty interests under state law is to be respected, *Continental Cas. Co. v. Associated Pipe & Supply Co.,* 447 F.2d 1041 (5th Cir. 1971), that court's designation of a state-granted license as a privilege and not a right is not dispositive for purposes of determining whether a property interest under the Fourteenth Amendment's Due Process Clause is present. *Espinoza v. Farah Mfg. Co., Inc.,* 414 U.S. 86, 94 S.Ct. 334, 38 L.Ed.2d 287 (1973). Indeed, the United States Supreme Court has expressly repudiated reliance on the so-called "right-privilege distinction" in assessing whether a legitimate entitlement to Due Process protection is implicated in a given case. *Board of Regents v. Roth,* 408 U.S. 564, 571, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972); *Goss v. Lopez,* 419 U.S. 565, 573, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975); *Arnett v. Kennedy,* 416 U.S. 134, 164, 171, 206, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974); *Perry v. Sindermann,* 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972); *Bell v. Burson,* 402 U.S. 535, 91 S.Ct. 1586, 29 L.Ed.2d 90 (1971); *Goldberg v. Kelly,* 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970).

The interests of plaintiff in exercising his commercial fishing license and using the paraphernalia which he has acquired in reliance thereon for the purpose of earning his livelihood are analogous to the "property rights" to tenured employment at a state university in *Board of Regents* and *Perry,* to public education in *Goss,* to government employment in *Arnett,* to a driver's license in *Bell,* and to welfare benefits in *Goldberg.* Once granted by the state, all of these "rights" create justifiable reliance on their continued availability absent some triggering event whose occurrence can only be determined by some fair procedure. Therefore, we conclude that even though the state has proprietary and regulatory interests in wildlife, plaintiff's interests in exercising his fishing license and using his paraphernalia constitute legitimate claims of en-

titlement within the ambit of "property rights" under the Due Process Clause of the Fourteenth Amendment.

■ Our conclusion that the right to pursue an occupation is a legitimate entitlement within the protective purview of the Due Process Clause is further bolstered by *Truax v. Raich*, 239 U.S. 33, 41, 36 S.Ct. 7, 10, 60 L.Ed. 131 (1915), where the court expressly held:

> "It requires no argument to show that the right to work for a living in the common occupations of the community is of the very essence of the personal freedom and opportunity that it was the purpose of the [Fourteenth] Amendment to secure."

Hence, we conclude that plaintiff is entitled to due process of law before his interests here at stake can be deprived. We now proceed to determine what process is due.

2. What Process is Due

■ In making the following determinations, we have been particularly mindful of the admonition against states passing criminal laws that due process requires that ". . . a fair warning should be given to the world in language that the common world will understand, of what the law intends to do if a certain line is passed." *McBoyle v. United States*, 283 U.S. 25, 27, 51 S.Ct. 340, 341, 75 L.Ed. 816 (1931); *Wright v. Arkansas Activities Ass'n (AAA)*, 501 F.2d 25, 28 (5th Cir. 1974).

a. Conflicting Penalties

■ We find no likely merit in the contention that sections 314 and 409 create conflicting penalties for the same offense. Both sections provide for confiscation of unlawful tackle.[3] "Confiscation" is defined in LSA R.S. 56:311 as "the exercise of a right under the police power wherein property is seized and held pending court order if the seized material is nonperishable or disposed of, without judicial intervention, if

perishable." The instant controversy centers only on nonperishable items, *viz.*, seized fishing nets. The disposition of such items, by definition, can only be made pursuant to court order. *See Mares v. Louisiana Wild Life and Fisheries Comm'n*, 236 So.2d 650, 653 (La.App.1970). Thus, there is no risk that the executive branch's enforcement authorities would arbitrarily destroy some tackle while returning others or that they have been improperly delegated lawmaking authority to evolve their own rational standards of enforcement. *Cf. Scott v. District Attorney, Jefferson Parish, State of Louisiana*, 309 F.Supp. 833, 836 (E.D.La.1970). In every case, it will be the court's order which determines the ultimate disposition of the seized property. As written, the statutes prevent the courts from arbitrarily selecting among options for the penalty to be imposed.

Section 314 relates to illegal, unlicensed, or improperly tagged tackle. The only category in which tackle violative of section 409 might also be covered by section 314 is if that tackle falls under the heading "illegal tackle" as intended by section 314. We think that section 314's intended meaning for the term "illegal tackle" encompasses only tackle which is somehow violative of a provision of Sub-Part A of Part VII governing sport and commercial fishing, *viz.*, sections 311 through 354. Gill nets which are violative of section 409 do not fall within the purview of "illegal tackle" as that term is used in section 314 unless they also violate some provision of Sub-Part A. Examples of tackle that fall within the intendment of section 314's reference to "illegal tackle" include, *inter alia*, "prohibited instruments, weapons, substances or devices" under section 320, elevated trotlines as a device for taking fish under section 321, seines or nets of proscribed mesh size under section 322, and bait seines of proscribed mesh size under section 323.

Further evidence of the lack of conflict between sections 314 and 409 is the fact

---

**3.** We note at the outset that confiscation and forfeiture penalties per se can constitutionally be imposed by the state in order to deter viola-

tion of its fish and game laws. *State v. Billiot*, 254 La. 988, 229 So.2d 72, 75 (1969).

that these two sections occur in different Sub-Parts of Part VII of Chapter 1 of Title 56. Section 314 appears in Sub-Part A which is entitled "Sport and Commercial Fishing" whereas section 409 occurs in Sub-Part B which is entitled "Miscellaneous Commercial Fishing Provisions and Closed Areas." The significance of the appearance of the sections in different sub-parts is shown by the fact that when a section is applicable across sub-part divisions, the legislative intent to make that section so applicable seems to be expressly indicated. For example, section 311 on "Definitions and construction" expressly indicates that it applies to Part VII even though section 311 is contained in Sub-Part A of Part VII. Similarly, where section 409, which is contained in Sub-Part B, relies on the definition of the "inside and outside shrimp line" found in section 495, which is contained in Sub-Part E, the statutory language of section 409 overtly refers to section 495.

Section 314 does not conflict with section 409. Plaintiff's contention that a person who read only section 314 and not section 409 might think mistakenly that he was subject only to section 314 is not grounds to find section 314 violative of due process of law. No person in the commercial fishing business could possibly expect to be covered only by the general provisions regarding both sport and commercial fishing set forth in Sub-Part A and to be immune from the provisions specifically designed to govern commercial fishing set forth in Sub-Part B. Surely, a person cannot claim violation of the notice requirements of due process of law based on that individual's failure to apprise himself of the whole law rather than reading only a portion thereof. Ignorance of the law, whether negligent or intentional, is no excuse.

Louisiana's laws governing fish and other aquatic life, set forth in Part VII of Chapter 1 of Title 56 of the Revised Statutes, form an integrated whole, whose individual sections cannot be read in isolation but must be understood in *pari materia*. See *Sevin v. Louisiana Wildlife and Fisheries Comm'n*, 283 So.2d 690, 693 (La.1973).

Read in context, the challenged penalty provisions are very clear, both on their face and in their applicational scope, and plaintiff has little chance of proving them vague, indefinite or inconsistent.

b. Inside and Outside Line

Petitioner's likelihood of success on the contention that the use of the "inside and outside line" concept (hereinafter sometimes referred to as "inside-outside line") in section 409 renders it unconstitutionally vague is negligible. The alleged vagueness has two origins: (1) the presence of clerical errors in a few of the latitudinal and longitudinal coordinates used to demarcate the inside-outside line and (2) the difficulty of determining the location of the line in practice due to erosion and tidal changes and the lack of artificial markers.

As to the first alleged deficiency, clerical and typographical errors in the Revised Statutes shall be disregarded when the meaning of the legislature is clear. LSA R.S. 1:5. This principle has received judicial as well as statutory sanction in Louisiana. For instance, in *State v. Rogers*, 148 La. 653, 87 So. 504, 506 (1921), the court stated:

"Verbal inaccuracies or clerical errors in the use of words or numbers in a statute may be recognized and corrected by the courts whenever necessary to carry out the manifest intention of the Legislature, as gathered from the context of the act."

Where the legislature's intent is manifest from the statutory context, so that, despite the presence of clerical or typographical errors, the statute gives the public and law enforcement officials adequate guidance in distinguishing between lawful and unlawful conduct, the constitutional vice of vagueness is absent. *Douglas v. Pitcher*, 319 F.Supp. 706, 710 (E.D.La.1970).

The instant challenge to section 409 affords opportunity for the application of this principle. Unlike the version of section 495 found unconstitutionally vague for lack of longitudinal-latitudinal coordinates or compass readings in *State v. Dardar*, 257

La. 191, 241 So.2d 905 (1970), the present version of section 495 describes the inside-outside line in three different ways. These descriptive modes are (1) landmarkings and compass readings, (2) latitudinal and longitudinal coordinates, and (3) Lambert's Coordinate System. A map purporting to picture the inside-outside line is annexed to section 495 and is regarded by the Louisiana Wildlife and Fisheries Commission as authoritative, although no express mention of the map is made in the language of section 495. The compass readings describing the inside-outside line are correct, but the descriptions based on longitudinal and latitudinal coordinates and on Lambert's System contain three major typographical errors. However, these errors are so large that any reasonable reading of the statute would reflect the correct coordinate. Furthermore, if one follows the description based on landmarkings and compass readings, he can accurately locate the position of the line. The particular numerical designations of latitude and longitude and Lambert's Coordinates are superseded by the verbal descriptions based on landmarkings and compass readings. *Cf.* LSA R.S. 1:6. This Court need not strictly adhere to the letter of this statute where to do so leads to an absurd consequence defeating legislative intent. *The Przemysl*, 23 F.2d 336, 340 (E.D.La.1927).

As to the second alleged deficiency (relating to the practical difficulty of ascertaining the location of the inside-outside line in the absence of any buoys or artificial markers in areas prone to tidal action and erosion), plaintiffs have cited us no authority nor have we been able to find any to support the proposition that practical difficulty in perceiving an imaginary line drawn by law renders the line or any law employing it constitutionally infirm under due process notice standards or otherwise.

The difficulty inherent in establishing many boundaries is recognized at various places in the law. For example, Rule 803(20) of the Federal Rules of Evidence allows reputation evidence as to the location of a boundary to be admitted as an exception to the general rule against hearsay evidence. The State of Louisiana has itself resorted to the use of artificial markers to fix the location of some of its boundaries, LSA R.S. 49:1, 4. The United States demarcates the lines dividing the high seas from rivers, harbors and inland waters by buoys, among other methods. 33 U.S.C. § 151. However, we are aware of no rule of law which dictates that a boundary over water must be demarcated by buoys or other artificial physical means. Also, while no evidence was introduced on the cost and physical difficulty of placing and maintaining a series of buoys spaced at quarter-mile intervals along the entire length of the inside-outside line, the Court takes judicial notice that both would be enormous. The cost and difficulty factors would be important to the state legislature in assessing the reasonableness of not adopting such a measure. We conclude that plaintiff is unlikely to succeed in proving the state's unreasonableness in not providing such physical aids to boundary determination.

The plaintiff's further contention that the language of section 495 creates vagueness because of the reliance on verbal references to landmarks and use of such phrases as "thence along the shoreline" is not likely to succeed because of the presence in the statute of additional aids to ascertainment of the line's location, *viz.*, compass readings. This factor totally distinguishes the present version of section 495 from that version invalidated in *State v. Dardar*, 257 La. 191, 241 So.2d 905, 907–908 (1970), on grounds that the statute was "equivocal" and "indefinite." Hence, plaintiff's likelihood of success on this due process challenge is slight.

B. Equal Protection Challenge

Also very unlikely is that plaintiff should succeed in maintaining an equal protection challenge to section 409 based on an alleged invidious discrimination in favor of sports fishermen over commercial fishermen.

We approach this equal protection contention via the two-tier analysis sanc-

tioned by the United States Supreme Court. *Shapiro v. Thompson*, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969); *Dandridge v. Williams*, 397 U.S. 471, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970); *James v. Valtierra*, 402 U.S. 137, 91 S.Ct. 1331, 28 L.Ed.2d 678 (1971); *Richardson v. Belcher*, 404 U.S. 78, 92 S.Ct. 254, 30 L.Ed.2d 231 (1971); *Bullock v. Carter*, 405 U.S. 134, 92 S.Ct. 849, 31 L.Ed.2d 92 (1972); *Dept. of Agriculture v. Moreno*, 413 U.S. 528, 93 S.Ct. 2821, 37 L.Ed.2d 782 (1973). First, we consider whether the classification used either involves any impermissible interference with the exercise of a fundamental right or is suspect and therefore warrants the application of strict scrutiny, *viz.*, requiring that the classification be dictated by some compelling state interest. Second, if strict scrutiny is called for, we will determine whether there is a compelling state interest; if strict scrutiny is not called for, then we determine whether the legislative classification is reasonable and rationally relates to the furtherance of a legitimate state objective.

■ The plaintiff's interests here at stake are economic, comprising the property interests in the particular confiscated nets as well as in the pursuit of a livelihood (which may also entail some degree of liberty interest). These interests are not fundamental within the purview of the Equal Protection Clause. *Kotch v. Board of River Pilot Comm'rs*, 330 U.S. 552, 67 S.Ct. 910, 91 L.Ed. 1093 (1947); *Williamson v. Lee Optical*, 348 U.S. 483, 75 S.Ct. 461, 99 L.Ed. 563 (1955), (the right to pursue a particular occupation is not fundamental for Equal Protection purposes); *Dandridge v. Williams*, 397 U.S. 471, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970) (the right to such necessities as welfare payments is not fundamental for Equal Protection purposes). Also, the classification used does not fall into those traditionally regarded as suspect. *See, e. g., Brown v. Board of Educ.*, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954) (race); *Takahashi v. Fish and Game Comm'n*, 334 U.S. 410, 68 S.Ct. 1138, 92 L.Ed. 1478 (1948) (national origin); *Graham v. Richardson*, 403 U.S. 365, 91 S.Ct. 1848,

29 L.Ed.2d 534 (1971) (alienage). Thus, strict scrutiny is not warranted by either the interests at stake or the classification used, and we therefore now undertake to determine whether the statute is rationally related to a legitimate governmental objective.

■ More particularly, since the legislation at issue is social or economic legislation, we must give a high degree of deference to the legislative judgment embodied in the law and must only uphold the Equal Protection attack if the law is not reasonable but is arbitrary and fails to bear a rational relationship to a permissible state objective. *Dukes v. City of New Orleans*, 501 F.2d 706, 710 (5th Cir. 1974).

### 1. Statutory Purpose

At the outset, we note that the language of section 409 evidences no discrimination between commercial and sports fishermen. Rather, the prohibitions of section 409 apply equally to all persons fishing in the area covered by section 409. Indeed, no reference is made in section 409 to either sport or commercial fishermen. The intent of the state legislature that section 409 apply to either type of fisherman is made indisputably clear by the statutory language that *"Any* such [gill] nets found in use in the area described above shall be confiscated and destroyed." (Section 409(A)) and *"Any* person found guilty of violating any provision hereof shall be subject to a fine of not less than two hundred dollars or more than five hundred dollars or imprisonment of not less than thirty days or more than six months." (Section 409(C)) (emphases added). The fact that section 409 appears in Sub-Part B which bears the heading "Miscellaneous Commercial Fishing Provisions and Closed Areas" does not demonstrate a discrimination against commercial fishermen inasmuch as (1) headings do not constitute part of the law, LSA R.S. 1:13, and (2) section 409 clearly pertains to the "Closed Areas" portion of the Sub-Part B heading as evidenced by the heading given to section 409, which reads "Use of gill nets,

trammel nets and seines in portions of Terrebonne and Lafourche Parishes," rather than to the "Miscellaneous Commercial Fishing Provisions" part of the heading of Sub-Part B.

Although the clear language of section 409 indicates no discrimination between commercial and sports fishermen, the parties have stipulated (1) that section 409's use of the inside-outside line to restrict the use of gill nets has no marine biological significance for fish, while it does have one for shrimp, and (2) that the motivation of the legislature in passing section 409 was to discriminate in favor of sports fishermen and against commercial fishermen in the allocation of the state's fishing resources.

■ As regards the second stipulation, together with plaintiff's contention that section 409 should be declared unconstitutional because section 409 merely reflects that "Sports Fishermen have a stronger and better organized lobby in the Louisiana Legislature [than commercial fishermen]" (Plaintiff's Memorandum at p. 32), we regard them as red-herrings in this case. It is axiomatic that a court "cannot undertake a search for motive in testing constitutionality." *Daniel v. Family Ins. Co.*, 336 U.S. 220, 224, 69 S.Ct. 550, 552, 93 L.Ed. 632 (1948). The court expressly repudiated arguments based on legislative motive in *Daniel* in the following language:

> "It is said that the 'insurance lobby' obtained this statute from the South Carolina legislature. But a judiciary must judge by results, not by the varied factors which may have determined legislators' votes." *Id.*

■ As already noted, the legislative language used in section 409 discloses no statutory purpose or legislative intent to discriminate against commercial fishermen. Nor have we been presented with any evidence that the statutory provision has an invidious differential impact on commercial fishermen.

The State of Louisiana has a number of concerns with reference to wildlife regulation.

■ As the state's Constitution of 1974 clearly states in Article IX, Section 1:

> "The natural resources of the state, including air and water, and the healthful, scenic, historic, and esthetic quality of the environment shall be protected, conserved, and replenished insofar as possible and consistent with the health, safety, and welfare of the people. The legislature shall enact laws to implement this policy."

Conservation, protection and replenishment of natural resources is clearly one of the state's legitimate objectives in regulating its aquatic life, but is not the only such objective. Plaintiff contends to the contrary, relying on LSA R.S. 56:1(A), which provides:

> "To protect, conserve, and replenish the natural resources of the state, the wildlife of the state, including all aquatic life, is placed under the supervision and control of the Louisiana Wildlife and Fisheries Commission, which is hereby created and established in the executive branch of the state government."

This statutory provision cannot reasonably be read as an indication that the State of Louisiana intends to restrict itself to wildlife laws aimed solely at conserving, protecting and replenishing its natural resources. Furthermore, the Louisiana Supreme Court has expressly noted that laws relating to aquatic life may have and, in some instances, do have legitimate objectives other than conservation. In *Sevin v. Louisiana Wildlife and Fisheries Comm'n*, 283 So.2d 690, 693 (La.1973), the court stated that "The State, for economic, conservatory, or other reasons, has determined that it is necessary to control inland shrimping for salt water shrimp." Only the dissenting Justice in *Sevin* found unconstitutionality in the fact that there was solely an economic justification for the statute there upheld by the majority in the face of the state's concession that there was no biological basis for the law. *Id.* at 695.

The instant statutory provision has a number of possible legitimate purposes, including discouragement of concentrated

catches of fish, promotion of the welfare of the people by encouraging a broader distribution of the fish resource, and promotion of tourism. It is not an instance of a state seeking an unlawful end or using a constitutional power to achieve an unconstitutional result. *Contrast, Gomillion v. Lightfoot,* 364 U.S. 339, 347–348, 81 S.Ct. 125, 5 L.Ed.2d 110 (1960).

### 2. Reasonable Classifications

Our reading of section 409 leads us to conclude that there are two statutory classifications whose reasonableness must be assessed, namely (1) gill net fishermen in general and (2) gill net fishermen inside the inside-outside line.

■ As regards the former classification, the corresponding class of similarly situated persons which the statute purports to regulate (*viz.*, the purported classification) consists of those fishermen who make concentrated catches of fish. The statutory classification is arguably underinclusive with respect to the purported class inasmuch as there may be some fishermen making concentrated catches who do not employ gill nets. However, the legislature may rationally have concluded that it could alleviate a significant part of the over-concentration of fish hauls by prohibiting gill net fishing in the circumscribed area without also eliminating all other possible methods of concentrated taking of fish from that area. "It is no requirement of equal protection that all evils of the same genus be eradicated or none at all." *Railway Express Agency v. New York,* 336 U.S. 106, 110, 69 S.Ct. 463, 466, 93 L.Ed. 533 (1948). Prohibiting gill nets but not other paraphernalia is reasonable if the legislature concludes from its experience that gill nets

are more likely to deplete resources than other devices used by commercial and sports fishermen. *Thomson v. Dana,* 52 F.2d 759, 763 (D.Or.1931).

As regards the statutory class of gill fishermen inside the inside-outside line, the corresponding purported class comprises fishermen who hamper tourist fishing. Again, the statutory class is arguably underinclusive inasmuch as those using gill nets outside the inside-outside line may also hamper tourist fishing by making concentrated catches. The legislature might reasonably conclude in light of its experience that sporting tourists will be more attracted by plentiful fishing close to shore (i. e., inside the line) and that use of gill nets close to shore tends to overharvest the fish population. While the parties have stipulated that the inside-outside line has no marine biological significance for fish, that line may nonetheless have an economic justification and thus be reasonable in allocating the fish resource of the state. Given the relatively primitive state of scientific knowledge regarding Louisiana's fin-fish resources, as evidenced by plaintiff's Exhibit 10,[4] it was not unreasonable for the state to use the same line for fish as is used for shrimp. Use of the same line would be administratively cheaper and more efficient than creating an entirely new line solely for purposes of section 409. Just because scientific knowledge in an area is limited does not prevent the state from regulating that area. Given the state's power to draw a line, exactly where the line should be drawn was a decision that could properly have rested on a number of policies. Prohibition of particular types of fish-catching devices in particular areas can be reasonable. *Thomson v. Dana,* 52 F.2d 759, 763 (D.Or. 1931). Here, the prohibition was reasonable.

---

**4.** Plaintiff's Exhibit # 10 is a letter from Professor Alva H. Harris, Professor and Director of Nicholls State University Marine Science Laboratory dated May 15, 1974, which states in pertinent part:

"A great deal of basic and applied research will have to be conducted before our fin-fish resources can be properly managed. The present controversy between sport and commercial fishermen over the use of gill nets or

seines is purely emotional and totally lacking in scientific fact as to the effect the nets have on our fishery resources. We do not know whether we are overharvesting or underharvesting, and the production potential of our trout, redfish, mackerel, pompano or other utilized species is unknown. Our sport and commercial fishes cannot be managed properly until sufficient studies have been conducted on target species."

### 3. Rational Relationship to Legitimate Goal

Furthermore, the statutory classifications have a fair and substantial relation to the object of the legislation, so that all persons similarly circumstanced are treated alike. All gill net users inside the line, regardless of whether they be commercial or sport fishermen, will be subject to the same sanctions. This statute is not an instance of a minority being subjected to different standards than a majority.

■ As noted above, we do not sit as a super legislature but merely assess the reasonableness of the products of the legislative process. Here, it does not seem likely that said product (section 409) can be shown to be violative of the canons of equal protection inasmuch as the statute appears to both use reasonable classifications and further legitimate state objectives, treating substantially similar persons equally.

### IV. IRREPARABLE INJURY

The injury to plaintiff by temporary or permanent deprivation of his property interests in equipment and pursuit of livelihood, as well as money lost through fines, is contended to be irreparable. However, adequate monetary compensation and restitution could be tendered which would fully repair plaintiff's alleged injuries.

■ That plaintiff's injuries would be the result of the enforcement of criminal statutes is not grounds to find the alleged injuries irreparable. Indeed, where a potential criminal defendant faces the threat only of an injury which is " . . . incidental to every criminal proceeding brought lawfully and in good faith . . . ." such harm is insufficient to justify a determination of irreparability. *Douglas v. Jeannette*, 319 U.S. 157, 164, 63 S.Ct. 877, 881, 87 L.Ed. 1324 (1942). While courts have considered potential economic hardships from enforcement of criminal statutes in assessing injury for purposes of issuing an injunction, such hardships must be irreparable before an injunction will issue. While plaintiff here is like the criminal defendant

in *Doran v. Salem Inn, Inc.*, 422 U.S. 922, 933, 95 S.Ct. 2561, 45 L.Ed.2d 648 (1974), in that he confronts possible loss of some business pending adjudication of any net seizure or fine, we have no evidence that such temporary impairment would threaten plaintiff with bankruptcy, which was the clinching factor in the *Doran* case. Here, the plaintiff's potential risks are of the type that are incidental to every criminal prosecution and do not warrant a finding of irreparability.

### V. BALANCE OF HARMS

In balancing the hardships of the parties, we apply the general proposition governing the federal issuance or denial of injunctive relief with respect to challenged state criminal laws which was articulated in *Watson v. Buck*, 313 U.S. 387, 400, 61 S.Ct. 962, 966, 85 L.Ed. 1416 (1941), as follows:

"Federal injunctions against state criminal statutes, either in their entirety or with respect to their separate and distinct prohibitions, are not to be granted as a matter of course, even if such statutes are unconstitutional. 'No citizen or member of the community is immune from prosecution, in good faith, for his alleged criminal acts. The imminence of such a prosecution even though alleged to be unauthorized and hence unlawful is not alone ground for relief in equity which exerts its extraordinary powers only to prevent irreparable injury to the plaintiff who seeks its aid.'" *Beal v. Missouri Pacific Railroad Corp.*, 312 U.S. 45, 49, 61 S.Ct. 418, 85 L.Ed. 577.

As noted in Section VI, *infra* the obvious public interest is in having constitutional laws enforced. Furthermore, plaintiff here has not established likelihood of success on the merits. Nor has he shown either (1) great immediate and irreparable injury as required by *Younger v. Harris*, 401 U.S. 37, 46–49, 91 S.Ct. 746, 27 L.Ed.2d 669 (1970) or (2) that he falls within the limited exception created by such cases as *Dombrowski v. Pfister*, 380 U.S. 479, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965), which allows federal injunctive relief where there is some unusual

extenuating circumstance, such as bad faith or harassment through repeated prosecutions brought to chill the exercise of constitutional rights rather than to obtain a valid conviction.

The balance of harms therefore favors denial of injunctive relief.

## VI. PUBLIC INTEREST

■ If there were a likelihood of success on any of plaintiff's constitutional challenges, then issuance of an injunction would serve the public interest by deterring legislators from enacting unconstitutional statutes. *Powell v. Stone*, 507 F.2d 93, 98 (9th Cir. 1974), rev'd on other grnds, 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976). However, since we conclude that the statutory provisions here under attack are probably constitutional exercises of Louisiana's police power (*see State v. Monteleone*, 171 La. 437, 131 So. 291, 292 (1930) and *Foster-Fountain Packing Co. v. Haydel*, 278 U.S. 1, 11, 49 S.Ct. 1, 73 L.Ed. 147 (1928)), we deduce that the public interest would not be served by dissuading legislators from passing nor enforcement officials from executing such statutes, nor by encouraging individuals to engage in conduct violative of such provisions in the probably forlorn hope of exculpation through constitutional infirmities in the provisions either facially or as applied.

The public interest therefore favors denial of preliminary injunctive relief.

Accordingly, since plaintiff has failed to demonstrate that he is entitled to the preliminary injunctive relief requested, IT IS THE ORDER OF THE COURT that the motion of plaintiff Roy Prospere for preliminary injunctive relief, be, and the same is hereby, DENIED.

IT IS THE FURTHER ORDER OF THE COURT that as to the motion of plaintiff Randolph Roy LaBauve for preliminary injunctive relief, it shall, and does hereby, ABSTAIN from entertaining the issue at this time.

## APPENDIX

LSA R.S. 56:495, together with the annexed map, appears in its entirety in West's Louisiana Revised Statutes Annotated as follows:

### § 495. Defining inside and outside waters

A. Solely for the purpose of this subpart, the shrimping waters of the state are divided into two classes, inside and outside waters. The line of demarcation of the classes of water shall commence at the coastal boundary between Texas and Louisiana and terminate at the coastal boundary between Mississippi and Louisiana and is more particularly described as follows, to wit:

Beginning at a point on the state line between Texas and Louisiana from "Texas Point", approx. lat. 29°41'10" N. (y–379,403.812) and long. 93°50'15" W. (x–1,204,904.234). Thence approx. N. 23°16' E., approx. 4000' to the southeast point of land of the Sabine Pass (Louisiana Point), lat. 29°42'15.69" N. (y–385,998.700), long. 93°49'54.80" W. (x–1,206,830.201). Thence in an easterly direction along the shoreline to the southwest point of land of Calcasieu Pass, approx. lat. 29°45'45" N. (y–404,077.514), long. 93°20'30" W. (x–1,362,-804.552). Thence N. 45°12' E. for approx. 1500' to the southeast point of land of Calcasieu Pass, lat. 29°46'10" N. (y–403,586.956), long. 93°20'20" W. (x–1,-363,729.979). Thence easterly along shore to the most southwesterly point of land, lat. 29°45'50" N. (y–403,401.423), long. 93°07' W. (x–1,434,193.329) at the mouth of the Mermentau River. Thence South 78°15' E. for approx. 4000' to a point of land at lat. 29°45'45" N (y–402,834.925), long. 93°06'15" W. (x–1,-438,151.141) on the southeast side of the mouth of the Mermentau River. Thence along the shore to a point of land on the southwest side of Southwest Pass, lat. 29°35'30" N. (y–337,081.836), long. 92°02'55" W. (x–1,772,661.803). Thence S. 65°45' E. to Lighthouse Point on the southeast side of Southwest Pass and the most westerly point of Marsh Island, lat. 29°35'30" N. (y–337,-

059.963), long. 90°02'15" W. (x–1,776,193.224). Thence along south shoreline to a point of land on the southeast side of Marsh Island known as South Point, lat. 29°29'55" N. (y–302,784.821), long. 91°45'30" W. (x–1,864,795.313). Thence S. 72°15' E. for approx. 106,000' to Eugene Island Lighthouse, lat. 29°22'20" N. (y–256,578.312), long. 91°23'03" W. (x–1,983,808.037). Thence S. 35°05' E. for approx. 16,000' to the most westerly point of land on Paint Au Fer Island, known as Point Au Fer, approx. lat. 29°19'59" N. (y–242,-332.842), long. 92°21'09" W. (x–1,993,892.453). Thence along the south shoreline to a point of land on the southwest side of the mouth of Oyster Bayou. Thence east for approx. 1,000' to the point on the southeast shore of Oyster Bayou. Thence along the south shore to a most southeasterly point of land on the west side of Bayou deWest, lat. 29°10'54" N. (y–187,388.661), long. 91°03'22" W. (x–2,088,471.285). Thence N. 86° E. for approx. 6,000' to the most southerly point of land on Pelican Island, lat. 29°10'58" N. (y–187,805.-958), long. 91°02'22" W. (x–2,093,789.151). Thence S. 62° E. for approx. 3,500' to the most southerly point of an island between Pelican Pass and Taylors Bayou, lat. 29°10'42" N. (y–186,197.642), long 91°01'48" W. (x–2,096,807.443). Thence S. 50° E. for approx. 2,600' to a point of land on the southeast side of the mouth of Taylors Bayou, lat. 29°10'28" N. (y–184,788.707), long. 91°01'26" W. (x–2,098,761.587). Thence S. 73° E. for approx. 4,600' to the most southeasterly point of land at the mouth of Jack Stout Bayou, lat. 29°10'14" N. (y–183,386.795), long. 91°00'36" W. (x–2,103,198.311). Hence along the south shoreline to a most easterly point of land on the west side of the mouth of Grand Bayou du Large, lat. 29°10'52" N. (y–187,271.979), long. 90°57'42" W. (x–2,118,612.364). Thence south 58°30' E. for approx. 8,000' to U.S.C. & G.S. Station Lite, lat. 29°09'59" N. (y–181,944.45), long. 90°56'36" W. (x–2,124,426.58). Thence in a southeast direction along the northeast shore of Caillou Bay to a most westerly point of land on the north side of Grand Pass Des Ilettes, lat. 29°07' N. (y–163,927.15), long. 90°53' W. (x–2,143,703.30). Thence south 36° E., for approx. 3,000' to the most westerly point of land on the south side of Grand Pass Des Ilettes, lat. 29°06'30" N. (y–160,902.77), long. 90°52'43" W. (x–2,145,223.31). Thence in a southeast direction along the northeast shore of Caillou Bay to the most westerly point on the north shore of Pass Wilson, lat. 29°04'50" N. (y–150,833.47), long. 90°51'15" W. (x–2,153,072.26). Thence S. 07° E., for approx. 3,000' to the most westerly point on the south shore of Pass Wilson, lat. 29°04'25" N. (y–148,308.18), long. 90°51'15" W. (x–2,153,082.82). Thence S. 34°30' E., for approx. 8,500' to the most westerly point on the south shore of Caillou Boca, lat. 29°03'45" N. (y–144,284.64), long. 90°50'30" W. (x–2,-157,093.59). Thence south, southeast along the west, southwest coast of the island to U.S.C. & G.S. Station Gap, lat. 29°02'18" N. (y–135,588.61), long. 90°49'56" W. (x–2,160,083.23). Thence along the south shore of the Isles Dernieres to a point on the east end of the Isles at Wine Island Pass, lat. 29°04'03" N. (y–146,442.463), long. 90°38'12" W. (x–2,222,581.891). Thence N. 83°15' E. for approx. 43,000' to the west end of Timbalier Island, lat. 29°04'42" N. (y–150,616.135), long. 90°31'30" W. (x–2,258,230.549). Thence eastward along the south shore to a point of land most southerly on the most easterly island of Timbalier Island at Little Pass Timbalier lat. 29°03'00" N. (y–140,625.375), long. 90°23'48" W. (x–2,299,311.349). Thence N. 57°15' E. for approx. 9,000' to a point of land most westerly of East Timbalier Island, lat. 29°03'42" N. (y–144,922.775), long. 90°22'33" W. (x–2,305,933.025). Thence easterly along the south shoreline to a point of land most southwest at the mouth of Belle Pass, lat. 29°05'10" N. (y–154,289.038), long. 90°12'40" W. (x–2,358,475.190). Thence to the east side at a point of land most southerly at the mouth of Belle Pass. Thence along the south shoreline to a point of land most easterly on the west side of Caminada Pass, lat. 29°11'45" N. (y–194,726.268), long. 90°03'00" W. (x–2,409,490.588). Thence N. 12°45' E. to a point of land most westerly of Grand Isle, lat. 29°12" N. (y–196,271.212), long. 90°02'30" W. (x–2,412,132.426). Thence along the south shoreline to the most easterly point of land of Grand Isle at Barataria Pass, lat. 29°16' N. (y–220,869.442), long. 89°56'45" W. (x–2,-442,415.018). Thence N. 47°22' E. for approx. 4,000' to Fort Livingston on the west end of Grand Terre Island, lat. 29°16'15" N. (y–222,416.754), long. 89°56'15"

W. (x–2,445,053.576). Thence along the south shoreline to a point of land most easterly on the west side of Quatre Bayou Pass, lat. 29°18'10" N. (y–234,-388.183), long. 89°50'55" W. (x–2,473,243.252). Thence east for approx. 7,500' to a point of land known as "Point Cheniere Ronquille", lat. 29°16'15" N. (y–222,819.058), long. 89°50'15" W. (x–2,476,936.262). Thence along the south shoreline to the most easterly point of land on the west side of Chaland Pass, lat. 29°18'10" N. (y–234,919.938), long. 89°43'30" W. (x–2,512,640.809). Thence east to the most westerly point of land on the east side of the mouth of Chaland Pass, lat. 29°18'10" N. (y–234,944.835), long. 89°43'10" W. (x–2,514,-411.472). Thence along the south shore to a most easterly point of land on the west side of Grand Bayou Pass, lat. 29°17'30" N. (y–231,094.316), long. 89°40'40" W. (x–2,527,749.780). Thence S. 63°50' E. for approx. 4,000' to a point of land most westerly on Shell Island, lat. 29°16'45" N. (y–226,658.863), long. 89°39'15" W. (x–2,535,342.486). Thence along the south shoreline of Shell Island and Pelican Island to a most easterly point of land on the west side of the mouth of Scofield Bayou, lat. 29°14'45" N. (y–215,020.176), long. 89°33'15" W. (x–2,567,409.628). Thence S. 71°35' E. for approx. 1,200' to a point of land on the southeast side of the mouth of Scofield Bayou, lat. 29°14'45" N. (y–215,-082.289), long. 89°32'30" W. (x–2,571,395.789). Thence along the south shoreline to a most easterly point of land on the west side of the mouth of Sandy Point Bay, lat. 29°13'15" N. (y–206,181.444), long. 89°30'15" W. (x–2,583,499.342). Thence S. 57°08' E. for approx. 9,500' to a point of land east of Sandy Point, lat. 29°12'15" N. (y–200,314.514), long. 89°28'00" W. (x–2,595,559.421). Thence south and east along shore to the most southerly point of land on the west side of the mouth of Tiger Pass, lat. 29°08'40" N. (y–178,893.215), long. 89°24'40" W. (x–2,613,647.055). Thence south to a point of land on the east side of Tiger Pass. Thence south along shore to a most southerly point of land on the west side of the mouth of Pass du Bois, lat. 29°05'00" N. (y–156,-914.655), long. 89°22' W. (x–2,628,215.435). Thence S. 80° E. for approx. 15,000' to the most southerly point of land at the southwest side of the mouth of Grand Pass, lat. 29°04'30" N. (y–153,999.566) long. 89°20'45" W. (x–2,634,922.150). Thence south for 2,500' to the most westerly point of land at Double Bayou, lat. 29°03'50" N. (y–149,959.679), long. 89°20'45" W. (x–2,-634,992.228). Thence along the east shoreline of West Bay to a most southerly point of land on the west side of the mouth of Southwest Pass, lat. 28°55'50" N. (y–101,094.506), long. 89°25'00" W. (x–2,613,174.599). Thence southeast to the most southerly point of land on the east side of the mouth of Southwest Pass. Thence northeast along the west shore of East Bay to the mouth of Joseph Bayou. Thence due east for approx. 1,400' to a point of land. Thence southeast along the east shoreline of East Bay to a most southerly point of land on the west side of South Pass, lat. 28°59'00" N. (y–121,928.889), long. 89°07'50" W. (x–2,704,326.993). Thence northwest along the west shore of Garden Island Bay to a most southerly point of land on the west side of Cadro Pass, lat. 29°04' N. (y–152,007.220), long. 89°10' W. (x–2,692,209.790). Thence east to a point of land most easterly on the south side of the mouth of Dennis Pass, lat. 29°04' N. (y–152,210.129), long. 89°08' W. (x–2,702,857.151). Thence N. 44°05' E. to the most easterly point of land on Lookout Island, lat. 29°05' N. (y–158,320.951), long. 89°07'30" W. (x–2,705,402.364). Thence S. 71°38' E. approx. 6,000' to a most southerly point of land on the west side of Redfish Bay, lat. 29°04' N. (y–152,520.301), long. 89°05' W. (x–2,718,829.142). Thence N. 87° E., for approx. 9,000' to the most southerly point of land on the southwest side of Southeast Pass, lat. 29°03' N. (y–146,671.408), long. 89°03' W. (x–2,729,597.-825). Thence N. 20°45' E. to the most easterly point on the north side of Northeast Pass, lat. 29°08' N. (y–177,128.928), long. 89°01'30" W. (x–2,736,-974.637). Thence north 37°20' E. for approx. 4,000' to the most easterly point of land on Thomasin Lumps, lat. 29°10' N. (y–187,366.927), long 89°20'20" W. (x–2,636,560.231). Thence N. 20°20' W. for approx. 6,000' to the most easterly point of the north side of the mouth of North Pass, lat. 29°12'30" N. (y–204,-342.951), long. 89°02' W. (x–2,733,767.055). Thence in a southwesterly direction to the most northerly point on the east shore of Thomasin Bayou, lat. 29°13'55" N. (y–212,801.412), long. 89°03'11" W. (x–2,727,305.081). Thence south 70°

W., for approx. 7,500′ to the most northerly point on the east shore of Meyers Bayou, lat. 29°12′30″ N. (y–204,078.555), long. 89°04′30″ W. (x–2,720,475.909). Thence in a southerly direction to a point in the most southeasterly portion of Customhouse Bay, lat. 29°12′ N. (y–201,101.315), long. 89°04′ W. (x–2,723,194.-087). Thence in a southwesterly direction along the south shore of Customhouse Bay to U.S.C. & G.S. Station Lout 1955, lat. 29°11′19″ N. (y–196,816.216), long. 89°05′19″ W. (x–2,716,261.606). Thence in a northerly direction along the west shore of Customhouse Bay to the most northerly point on the east shore of Willies Bayou, lat. 29°12′30″ N. (y–203,970.684), long. 89°05′32″ W. (x–2,714,-982.211). Thence in a northwesterly direction along the shore to the most northerly point on the east shore of Tommy Dantz Bayou, lat. 29°12′57″ N. (y–206,597.295), long. 89°06′30″ W. (x–2,709,789.976). Thence north 50°30′ W. for approx. 2,500′ to the most easterly point in the most northeasterly point of Hingle Pass, lat. 29°13′10″ N. (y–207,937.744), long. 89°06′14″ W. (x–2,711,182.056). Thence in a northerly direction to the most northerly point on the east shore of Raphael Pass, lat. 29°13′58″ N. (y–212,750.905), long. 89°06′34″ W. (x–2,709,-315.990). Thence north 45° W. for approx. 4,800′ to the most easterly point on the south shore of Twenty-Seven Pass, lat. 29°03′47″ N. (y–150,974.103), long. 89°07′15″ W. (x–2,706,875.511). Thence in a northerly direction to the most easterly point on the south shore of Dead Women Pass, lat. 29°15′15″ N. (y–220,482.626), long. 89°07′ W. (x–2,706,862.285). Thence north 18°30′ W., for approx. 2,200′ to the most northerly point on the north shore of Dead Women Pass, lat. 29°15′38″ N. (y–222,800.292), long. 89°07′03″ W. (x–2,706,-551.655). Thence N. 59°30′ W. for approx. 7,000′ to Harris (B.S.E.) Station, lat. 29°16′28″ N. (y–226,763.201), long. 89°18′05″ W. (x–2,647,832.795). Thence in a northerly direction along the shore to the most northerly point on the east shore of Contrariete Pass, lat. 29°17′04″ N. (y–231,388.296), long. 89°8′ W. (x–2,701,336.814). Thence in a northwesterly direction along the shore to the most northerly point on the east shore of Bienvenue Pass, lat. 29°17′30″ N. (y–233,988.602), long. 89°8′15″ W. (x–2,699,958.363). Thence in a westerly direction along shore to Octave (B.S.E.) Station, lat. 29°17′45″ N. (y–235,405.-427), long. 89°09′13″ W. (x–2,694,794.481). Thence in a northerly direction along shore to the most northerly point of the east shore of the east fork of Gaspar Bayou, lat. 29°18′07″ N. (y–237,627.248), long. 89°09′13″ W. (x–2,694,-752.212). Thence in a northwesterly direction along the shore to the most northerly point on the east shore of the west fork of Gaspar Bayou, lat. 29° 18′36″ N. (y–240,537.499), long. 89°09′24″ W. (x–2,693,722.776). Thence N. 46° W., approx. 5,000′ to the most easterly point on the north side of Delta Pass, lat. 29°18′34″ N. (y–240,271.766), long. 89°10′02″ W. (x–2,690,362.848). Thence N. 36°30′ W., for approx. 14,000′ to the most northerly point on the east side of Main Pass, lat. 29°21′ N. (y–254,870.205), long. 89°11′30″ W. (x–2,682,297.441). Thence N. 70° W., approx. 4,000′ to the most northerly point on the west shore of Main Pass, lat. 29°21′15″ N. (y–256,325.687), long. 89°12′06″ W. (x–2,-679,083.800). Thence in a southwesterly direction along the shore to the most northerly point on the east shore of Octave Pass, lat. 29°19′16″ N. (y–244,230.-427), long. 89°12′53″ W. (x–2,675,147.402). Thence in a southwesterly direction along the shore to the most westerly point of the north shore of Battery Bayou, lat. 29°18′05″ N. (y–236,975.107), long. 89°13′45″ W. (x–2,670,676.529). Thence in a west, northwest direction along the shore to the most northerly point on the west shore of Spoonbill Bend which is also the most northerly point on the east shore of East Fork Pass, lat. 29°18′32″ N. (y–239,625.749), long. 89°14′32″ W. (x–2,666,465.933). Thence in a northwesterly direction along shore to the most northerly point on the east shore of Emeline Pass, lat. 29°20′45″ N. (y–252,988.591), long. 89°15′15″ W. (x–2,662,415.743). Thence north 38°30′ W., approx. 5,000′ to the most northerly point on the west shore of Kimbel Pass, lat. 29°21′38″ N. (y–258,246.878), long. 89°16′14″ W. (x–2,657,-098.499). Thence N. 66° W., approx. 20,000′ to the most northerly point on the south side of Taylor Pass, lat. 29°23′27″ N. (y–268,900.748), long. 89°20′ W. (x–2,636,910.524). Thence N. 47° E., for approx. 47,000′ to the most westerly point of land of Breton Island, lat. 29°28′ N. (y–297,090.147), long. 89°13′30″

W. (x–2,670,898.710).   Thence along the southeast shoreline to the most north-easterly point of land, lat. 29°29′ N. (y–303,495.895), long. 89°10′ W. (x–2,689,-344.357).   Thence N. 58°05′ E. for approx. 9,000′ to the most westerly point of land of Gosier Island, lat. 29°32′ N. (y–322,081.380), long. 89°06′ W. (x–2,-710,197.966).   Thence along the east shore to the most northerly point of land of Gosier Island, lat. 29°35′ N. (y–340,572.855), long. 89°03′ W. (x–2,725,733.566).   Thence N. 43°30′ E. for approx. 13,000′ to the most easterly point of land of Curlew Islands, lat. 29°39′ N. (y–365,457.156), long. 88°57′ W. (x–2,757,-

008.848). Thence along the east shoreline of the Chandeleur Islands, going north to the Chandeleur light, lat. 30°02′52″ N. (y–510,843.735), long. 88°50′09″ W. (x–2,790,113.129), terminating at the Mississippi boundary.

B. All waters of the state shoreward of the line described in Subsection A hereof within which the tide regularly rises and falls or into which salt-water shrimp migrate are inside waters. All waters seaward of the line described in Subsection A of this section are outside waters.