**BURNS HARBOR FISH COMPANY, INC., Plaintiff,**

v.

**Patrick D. RALSTON, as Director of the Indiana Department of Natural Resources, and the State of Indiana, Defendants.**

No. IP 89–433–C.

United States District Court, S.D. Indiana, Indianapolis Division.

July 23, 1992.

Steven Kovachevich, Gary, Ind., for plaintiff.

Michael T. Schaefer, Deputy Atty. Gen., Indianapolis, Ind., for defendant.

## MEMORANDUM ENTRY DISCUSSING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT[1]

TINDER, District Judge.

### I. *Factual Background*

Fishing is a sport for some and a living for others. The proprietors of the plaintiff corporation in this case make their living by fishing in the Indiana waters of Lake Michigan. Plaintiff, however, must share its fishing grounds with a plentitude of sport fisherman who ply the cold waters of the Lake for adventure and for enjoyment.

The arbiter between the interests of commercial fishermen and those of sport fishermen in this case is the Indiana Department of Natural Resources (the "DNR"). The DNR licenses commercial fishermen. A license is required in order to fish for profit in the Indiana waters of Lake Michigan. Ind.Code § 14-2-7-11 (Burns 1987).

The Burns Harbor Fish Company, Inc. ("Burns Harbor") has been engaged in commercial fishing operations in Lake Michigan for some time and currently holds four Indiana commercial fishing licenses. Of central importance to Burns Harbor's ability to conduct a profitable fishing business is its ability to efficiently extract large numbers of perch from the Lake.

Until September of 1986 Burns Harbor used what are known as "gill nets" to catch perch. Unfortunately, however, gill nets cannot discriminate among fish, and the nets which commercial fishermen used to snare perch also reaped a harvest of chinook salmon and trout. The fact that numbers of chinook salmon and trout, both prized sport fish, were being caught in commercial fishermen's gill nets was cause for some concern at the DNR as the DNR annually stocks the Lake with large numbers of salmon and trout.

Eventually, in August 1986, after conducting several studies about the effect that gill net fishing had on the salmon and trout populations in Lake Michigan, the DNR announced that, pursuant to its regulatory authority codified at Ind.Code § 14-2-1-1 *et seq.* (Burns 1987), it would enforce a six week ban on the use of gill nets to fish in Lake Michigan. The ban was to last from September 15, 1986 until October 31, 1986.[2] The reasons given for the ban by the DNR was that gill netting wasted a public resource (chinook salmon and trout); reduced sport fishing in the Indiana waters of Lake Michigan; threatened to nullify the extensive stocking efforts of the DNR; and could cause economic harm to those individuals, businesses and communities that relied upon sport fishing.

Thereafter, the Indiana legislature made the ban permanent by enacting Ind.Code §§ 14-2-7-11(d) and (e) (Burns 1987) which prohibit gill net fishing in the Indiana waters of Lake Michigan and provide for automatic and permanent termination of the commercial fishing license of anyone taking fish from Lake Michigan by means of a gill net. The statutory ban was enacted despite efforts by the plaintiff and others to encourage the amendment of the statute to permit the seasonal use of gill nets with compensation to the DNR for any catch other than perch. In addition, the plaintiff has proposed various other alternatives to the ban on gill net fishing, none of which have been adopted.

The plaintiff alleges that the statutory ban on gill net fishing has had a devastating effect on its once profitable fishing operation and that the prohibition threatens to drive the Burns Harbor Fish Company out of the commercial fishing business alto-

---

1. In a prior entry on defendants' motion for summary judgment this Court disposed of certain of plaintiffs' claims; however, this Court subsequently granted plaintiffs' motion for reconsideration. This entry is issued after thorough briefing by all the parties on all of the relevant issues. This entry on defendants' motion for summary judgment supersedes all previous rulings made by this Court and in combination with the accompanying judgment dispos-

es of each of plaintiffs' claims against defendants.

2. The timing of the ban was motivated by the DNR's concern that the weeks between mid-September and the end of October is the time that juvenile salmon and trout are most vulnerable to capture in gill nets.

gether. By its complaint[3] the plaintiff has objected to the statutory gill net ban as violative of its due process rights under the federal constitution. Burns Harbor also contends that the statute has worked a taking of its property without just compensation.

In response, the defendant seeks a summary determination on plaintiff's claims. Defendants contend both that plaintiff has failed to adequately allege a property right that has been taken by the enforcement of the ban on gill net fishing and that plaintiff has failed to adequately allege a property interest that is subject to due process protection.

## II. *Procedural History*

The original DNR six week[4] regulatory ban on the use of gill nets was challenged in state court by a group of plaintiffs that included two of the officers of the Burns Harbor Fish Company. The trial court found in favor of the plaintiffs but was reversed by the Indiana Court of Appeals which ruled that Indiana's commercial fishermen do not have a property interest in the State's fish or in their fishing licenses. *See Ridenour v. Furness*, 504 N.E.2d 336, 340 (Ind.App.1987), *aff'd*, 514 N.E.2d 273 (Ind.1987).[5]

The summary judgment motion offered by the defendants in this case is premised almost exclusively upon the holding of the Indiana Court of Appeals in the *Ridenour* case. Essentially defendants' position is that the Indiana court's holding in *Ridenour*, that commercial fishermen had no property interest in either the fish in Lake Michigan or in their fishing licenses, precludes any possibility of the plaintiff prevailing in this action.

Some months ago this Court granted defendants' motion for summary judgment. In ruling upon defendants' motion this

Court found that this case and the prior *Ridenour* action in state court involved substantially similar parties and had a similar legal format. *Ridenour* involved an attempt to overturn or to obtain compensation for a ban on gill net fishing; so does this case.

In addition, this Court determined that the fact that the ban involved in *Ridenour* was the result of a regulation issued by the DNR and that the ban in this case was a statutory enactment was immaterial to the legal issues involved. Accordingly, based on the *Ridenour* court's holding that Indiana fishermen do not have a property interest in fish located in Indiana waters, this Court held that the plaintiff in this case could not rely on a theory that it had a property interest in fish found in Indiana waters. While this Court based its ruling on a theory of collateral estoppel, it is clear that the federal constitution would not afford a recovery to plaintiff pursuant to a theory that plaintiff has a property interest in fish found in Indiana waters. *See Douglas v. Seacoast Products, Inc.*, 431 U.S. 265, 284, 97 S.Ct. 1740, 1751, 52 L.Ed.2d 304 (1977) ("A State does not stand in the same position as the owner of a private game preserve and it is pure fantasy to talk of 'owning' wild fish, birds, or animals. Neither the States nor the Federal Government, any more than a hopeful fisherman or hunter, has title to these creatures until they are reduced to possession by skillful capture"); *see also Hughes v. Oklahoma*, 441 U.S. 322, 334–36, 99 S.Ct. 1727, 1735–36, 60 L.Ed.2d 250 (1970) (state does not have ownership interest in minnows). Indeed, plaintiff does not dispute that part of this Court's prior ruling precluding plaintiff from attempting to recover under a theory that it had a property interest in fish swimming in Indiana waters.

---

**3.** Plaintiff has filed a motion to amend its complaint. Defendants have not objected to this motion. Accordingly, plaintiff's motion to amend its complaint is GRANTED and this Court will rely on plaintiff's First Amended Complaint.

**4.** The precise period of time covered by the September 15 to October 31 regulatory ban was 47 days.

**5.** The Indiana Supreme Court essentially "adopt[ed] the opinion of Chief Judge Ratliff" reported at 504 N.E.2d 336. *Ridenour v. Furness*, 514 N.E.2d 273, 274 (Ind.1987).

Plaintiff's motion to reconsider this Court's prior ruling granting summary judgment in favor of defendants does contest this Court's conclusion that plaintiff does not have property in its fishing licenses that requires protection pursuant to the takings clause of the fifth amendment or the due process clause of the fourteenth amendment. Because the plaintiff did not directly confront the due process and takings issues in its prior briefing and because of the important constitutional and environmental issues at stake in this litigation this Court granted the motion to reconsider and now considers for the second time the propriety of granting summary judgment in this action.

## III. *Discussion*

The federal constitution protects various kinds of "property" in various ways. The fifth amendment prohibits the government from taking property without just compensation. The due process clause of the fourteenth amendment provides that no person shall be deprived of life, liberty, or property without due process of law.

At the heart of some of the confusion over the legal issues in this case has been a tendency to assume that the "property" given protection by the takings clause is equal to the "property interests" that are protected by the requirement of due process of law. The definitions of "property" protected by each of these provisions are, however, not necessarily identical.

### A. *Takings Clause Analysis*

■ It is clear that the Burns Harbor Fish Company has a property interest in the gill nets that the Company bought and paid for. The State of Indiana could not appropriate these nets from the plaintiff without due process or without paying compensation. However, the State of Indiana did not attempt to take gill nets away from Burns Harbor.

Rather, the State merely forbids Burns Harbor from using gill nets within the confines of the Indiana waters of Lake Michi-

gan. All indications are that Burns Harbor still has dominion and control over its gill nets. Burns Harbor can sell its nets, it can put them to other uses, it can fish with them outside of Indiana waters.[6] Indeed, it can do virtually anything it wants with its nets except use them to fish in Indiana waters. While the ban on gill net fishing prevents Burns Harbor from obtaining economic benefit from its nets when fishing in Indiana waters, the State's regulation cannot be considered a taking of the gill nets because the State of Indiana by regulating gill net fishing is simply exercising its sovereign right and responsibility to oversee and regulate the environment and wildlife within the State.

When an individual or corporate entity purchases personal property (as opposed to real property) to engage in a commercial venture the purchaser is taking a risk that government regulation will diminish the value of that property. "[B]y reason of the State's traditionally high degree of control over commercial dealings, [such a purchaser] ought to be aware of the possibility that new regulation might even render his property economically worthless." *Lucas v. South Carolina Coastal Council,* — U.S. —, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992). Indeed, where the item purchased could potentially invoke environmental concerns the purchaser must be especially wary in these days of growing environmental concern. *See, e.g., Andrus v. Allard,* 444 U.S. 51, 66–68, 100 S.Ct. 318, 327–28, 62 L.Ed.2d 210 (1979) (no taking where the Eagle Protection and Migratory Bird Treaty Acts prohibited the sale of artifacts containing eagle feathers); *see also State of Louisiana ex rel. Guste v. Verity,* 853 F.2d 322, 324 (5th Cir.1988) (regulation required shrimp trawlers to trawl for no more than 90 minutes at a time or to use turtle excluder devices on their nets); *Organized Fishermen of Florida v. Hodel,* 775 F.2d 1544, 1547–48 (11th Cir.1985) (commercial fishermen could be prohibited from fishing in Everglades National Park despite long past practice of commercial fishing in the Park),

---

**6.** Burns Harbor points out that there are gill net fisheries in the Illinois waters of Lake Michigan and the Pennsylvania and Canadian waters of Lake Erie.

*cert. denied,* 476 U.S. 1169, 106 S.Ct. 2890, 90 L.Ed.2d 978 (1986).

Plaintiff also contends that purchase of the gill nets coupled with the purchase of its fishing licenses gave it an "investment-backed expectation" that it could continue indefinitely to fish in Indiana waters using gill nets. However, any such "expectation" maintained by the plaintiff was patently unreasonable. Plaintiff has never had an unrestricted right to use gill nets to fish within Indiana waters. In Indiana commercial fisherman are required to be licensed by the DNR. Thus, use of gill nets to fish in the Indiana waters of Lake Michigan has, since the enactment of Indiana's licensing statute, been contingent upon maintenance of a valid commercial fishing license. Moreover, commercial fishing licenses issued by the DNR are for a limited term of one year and are revocable for failure to comply with "the terms of the license or of [the] article [of the Indiana Code authorizing the issuance of fishing licenses] or orders or rules issued and promulgated" by the DNR. Ind.Code § 14-2-7-12 (Burns 1987).

Plaintiff was, therefore, well aware that the terms under which it was permitted to fish in Lake Michigan could change at any time that the DNR determined to change those terms. Indeed, the licensing statute in force at the time that the temporary ban on gill net fishing was issued by the Director of the DNR and that remained in force at the time the Indiana General Assembly passed the law permanently banning the use of gill nets specifically provided that:

> With respect to a commercial fishing license on Lake Michigan, the director [of the DNR] may establish, by rule under IC 4-22-2, *a restriction on* the localities fished and *the kind and amount of fishing gear employed.*

Ind.Code § 14-2-7-12(d) (Burns 1987) (emphasis added).

"[I]nvestment-backed expectations are reasonable *only if they take into account the power of the state to regulate in the public interest." Pace Resources, Inc. v. Shrewsbury Township,* 808 F.2d 1023, 1033

(3rd Cir.1987), (emphasis added), *cert. denied,* 482 U.S. 906, 107 S.Ct. 2482, 96 L.Ed.2d 375 (1987). Any expectation that once Burns Harbor obtained its fishing license Burns Harbor would be able to fish commercially without subsequently enacted restrictions on the type of equipment it would be permitted to use was clearly unreasonable. Such an expectation failed to take into account the power of the DNR or of the Indiana General Assembly to regulate in the public interest, a power that was clearly spelled out by statute. *See, e.g., Pace Resources,* 808 F.2d at 1033 (property owner did not have reasonable expectation that it would be permitted to use its property in accordance with its original plan in light of "the legitimate interest of municipalities in being able to modify land use planning rules when they perceived the need for change"); *see also Bowen v. Public Agencies Opposed to Social Security Entrapment,* 477 U.S. 41, 52, 106 S.Ct. 2390, 2396, 91 L.Ed.2d 35 (1986) (holding that even "contractual arrangements, including those to which a sovereign itself is party, 'remain subject to subsequent legislation' by the sovereign").

In addition, there is a wealth of federal precedent standing for the proposition that by purchasing or otherwise obtaining a license to perform an act upon state owned land or waterways an individual does not thereby acquire property that is subject to takings clause protection against the licensor. *See Marine One, Inc. v. Manatee County,* 898 F.2d 1490, 1492-93 (11th Cir.1990) ("[b]oth federal and ... state cases stand for the proposition that permits to perform activities on public land—whether the activity be building, grazing, prospecting, mining or traversing—are mere *licenses* whose revocation cannot rise to the level of a Fifth Amendment taking") (emphasis original); *Acton v. United States,* 401 F.2d 896, 899 (9th Cir.1968) ("a license does not constitute property for which the Government is liable upon condemnation"), *cert. denied,* 393 U.S. 1121, 89 S.Ct. 1003, 22 L.Ed.2d 128 (1969), 395 U.S. 945, 89 S.Ct. 2018, 23 L.Ed.2d 463 (1969); *see also United States*

*v. Locke,* 471 U.S. 84, 104–05, 105 S.Ct. 1785, 1798, 85 L.Ed.2d 64 (1985) ("[t]he United States, as owner of the underlying fee title to the public domain, maintains broad powers over the terms and conditions upon which the public lands can be used, leased, and acquired.... [c]laimants thus must take their mineral interests with the knowledge that the Government retains substantial regulatory power over those interests"); *United States v. Fuller,* 409 U.S. 488, 493, 93 S.Ct. 801, 804, 35 L.Ed.2d 16 (1973) (government exercised its power of eminent domain over lands owned in fee by the plaintiff, however, the fifth amendment did not require that government compensate plaintiff for the incremental increase in value to plaintiff's lands that was attributable to plaintiff's permit to use adjacent government owned land to graze plaintiff's cattle).

The logic behind the above cases is simple: because the state or federal entity which authorized the license may revoke the license without effecting a taking of property, the granting entity may likewise enforce reasonable limitations upon the licensee's use of the license. Thus, the listed cases reflect that the State which "giveth" may take or limit a license in almost any reasonable way. *But cf. Philly's v. Byrne,* 732 F.2d 87, 90 (7th Cir.1984) (Posner, J.) (noting that Justice Holmes construction that "the power to prohibit implies an unlimited power to regulate short of prohibition" is not always favored).[7]

 That is not to say that a license to hunt or fish on state-owned land or water is not considered to be "property" for all purposes. A license may very well be considered property in relation to a third party. Indeed, the federal government may be required to pay just compensation when it decreases or eliminates the value of a license given by state government. *See, e.g., Jackson v. United States,* 103 F.Supp. 1019, 1020, 122 Ct.Cl. 197 (1952) (federal government required to pay compensation to fisherman whom it forbade from fishing waters located near military proving ground; fisherman was unable to acquire state license to fish elsewhere). Moreover, there is little question that the State of Indiana could not condition use of plaintiff's license on the relinquishment of a substantive constitutional right. *See, e.g., Philly's,* 732 F.2d at 90 (opining that grant of a liquor license could not be made subject to agreement to give up the right to the free exercise of religion); [8] *accord Sherbert v. Verner,* 374 U.S. 398, 404, 83 S.Ct. 1790, 1794, 10 L.Ed.2d 965 (1963) ("[i]t is too late in the day to doubt that the liberties of religion and expression may be infringed by the denial of or placing of conditions upon a benefit or privilege").

The plaintiff in this case, however, is not seeking compensation from a third party.[9] Instead, this plaintiff wants compensation from the State of Indiana, the very entity that authorized Burns Harbor's licenses to fish in the first instance. This Court concludes that the Burns Harbor Fish Company could have had no reasonable expectation that it obtained its fishing licenses free and clear of the potential that the value of

---

**7.** While Judge Posner, writing for a panel of the Seventh Circuit in the *Philly's* case, took issue to some extent with Holmes' famous construction, none of the cases cited by Judge Posner as rejecting the Holmes construction involved restrictions upon licenses. *See Philly's,* 732 F.2d at 90. Moreover, each of the cases cited in *Philly's* involved an attempt to condition the exercise of a state-granted privilege upon the disavowal of a constitutional right. Such cases are far from the circumstances of the case at bar. This case involves a license to harvest fish from the state-owned waters of Lake Michigan. A case could hardly be hypothesized in which it would be more abundantly clear that the state maintained a continuing interest in regulating the conduct of a licensee. Finally, it should be noted that the cases cited in the *Philly's* case did not prevent the Seventh Circuit's ultimate conclusion that the State of Illinois could condition a liquor license upon the possibility of future revocation by referendum of the voters in the precinct in which the establishment maintaining the license was located.

**8.** The *Philly's* case points out, however, that the grant of a license may be conditioned "on the acceptance of something less than the full range of possible procedural safeguards to protect its enjoyment." *Philly's,* 732 F.2d at 90.

**9.** Nor, of course, is the State of Indiana seeking to impose an unconstitutional obligation upon the exercise of the plaintiff's license.

its licenses would be subsequently diminished by environmental regulations duly promulgated by the DNR or by statute passed by the Indiana General Assembly. Current constitutional analysis does not regard plaintiff's loss as a taking but merely considers it a cost of doing business.[10]

### B. Procedural Due Process Analysis
#### 1. Property interest

While the Burns Harbor Fish Company did not have property taken from it that requires compensation from the State of Indiana pursuant to the takings clause, this Court must still determine whether the plaintiff's license is a protectible "property interest" within the meaning of the due process clause. As this Court has already noted, the definitions of the word "property" in takings clause analysis and of the term "property interest" in due process analysis are not necessarily coextensive. See Reed v. Village of Shorewood, 704 F.2d 943, 948 (7th Cir.1983) (merely because licenses do not have "some of the conventional attributes of property ... does not mean they are not property in a due process clause sense").

Property interests "are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." Board of Regents v. Roth, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972). To have a property interest in a government provided benefit—such as a commercial fishing license—a person "must have more than an abstract need, ... desire [or unilateral ex-

pectation] for it." Id. "A legitimate claim of entitlement" to the benefit is required. Id.

The position of the Indiana courts is that a fishing "license is a privilege, not a right, [and it] is revocable." Ridenour, 504 N.E.2d at 340. Nevertheless, the state court's determination that plaintiffs do not have a property interest in their licenses is not controlling upon this Court. Instead, this Court is bound to apply federal constitutional principles which require a "functional" analysis of state law to determine whether that law creates a legitimate claim of entitlement for plaintiff in its licenses. Reed, 704 F.2d at 948; accord Bell v. Burson, 402 U.S. 535, 539, 91 S.Ct. 1586, 1589, 29 L.Ed.2d 90 (1971) ("relevant constitutional restraints limit state power to terminate an entitlement whether the entitlement is denominated a 'right' or a 'privilege' ").

After reviewing the Indiana licensing statute this Court concludes that plaintiff has a protectible property interest in its fishing licenses. Plaintiff pays for the right to fish the Indiana waters of Lake Michigan. The right to fish commercially is limited[11] and has value. Moreover, the Indiana licensing statute creates specific rules for when a license may be revoked. A commercial fishing license "may be revoked ... for failure to comply with the terms of the license or of [the licensing statute] or orders and rules promulgated" by the DNR. Ind.Code § 14–2–7–12 (Burns 1987).

This Court concludes that as a matter of Indiana law a commercial fishing license may not be revoked absent cause as set

10. After gill net fishing was banned many fishermen (upon the DNR's recommendation) resorted to impoundment nets to trap perch. The DNR imposed limits on the amount of pots (a pot is essentially a fish trap) permitted per impoundment rig. Burns Harbor initially requested authorization to use more pots per rig but was turned down by the DNR. However, when it became apparent that impoundment rigs were producing a perch harvest far smaller than that anticipated by the DNR, the DNR authorized doubling the number of pots per rig and also increased the allowable number of undersized perch that could be kept. Burns Harbor con-

tends that the DNR's restrictions on impoundment fishing resulted in a temporary taking of property. However, for reasons identical to those described with respect to the DNR's power to impose a gill net ban Burns Harbor cannot recover for a temporary taking of its property based on the DNR's regulation of impoundment net fishing.

11. At the time of this litigation the DNR had authorized only 20 licenses for commercial fishing in the Indiana waters of Lake Michigan.

forth in Ind.Code § 14–2–7–12. Thus, for the duration of its licenses Burns Harbor had a legitimate claim of entitlement to fish in accordance with the terms of those licenses. Burns Harbor's licenses, therefore, constitute a property interest within the meaning of the fourteenth amendment. This conclusion should not be surprising, however. Licenses have been frequently held to create protectible property interests for the licensees that hold them. *See Barry v. Barchi*, 443 U.S. 55, 64, 99 S.Ct. 2642, 2649, 61 L.Ed.2d 365 (1979) (horse trainer's license); *Bell*, 402 U.S. at 539, 91 S.Ct. at 1589 (driver's license); *Easter House v. Felder*, 910 F.2d 1387, 1395 (7th Cir.1990) (child welfare agency license), *cert. denied,* — U.S. —, 111 S.Ct. 783, 112 L.Ed.2d 846 (1991); *Reed*, 704 F.2d at 948 (liquor license); *LeBauve v. Louisiana Wildlife & Fisheries Comm'n*, 444 F.Supp. 1370, 1378–79 (E.D.La.1978) (fishing license).[12]

■ Nevertheless, the conclusion that plaintiff has a property interest in its fishing licenses does not decide the issue of whether the gill net fishing ban deprived Burns Harbor of a property interest. The ban did not appropriate plaintiff's license. The ban, rather, merely limited the means which Burns Harbor could use to catch fish. The ban no doubt cut into plaintiff's profit margin and may even, as plaintiff contends, have made commercial perch fishing impracticable. However, the risk that such a detriment will result from a newly imposed environmental rule or regulation is faced by most businesses.

As this Court has already noted, the possibility that the DNR would introduce regulations that would alter the permissible means for commercially gathering fish was apparent on the face of the licensing statute. Thus, for the same reasons set forth in this Court's discussion regarding why plaintiff could not have had a *reasonable* investment-backed expectation that it would be able to fish indefinitely without a gill net restriction, this Court concludes

that Burns Harbor never had a legitimate claim of entitlement to fish pursuant to its licenses that was not encumbered by the State of Indiana's preeminent right to enforce restrictions on fishing equipment that are reasonably related to a legitimate state purpose. *See Perry v. Sindermann*, 408 U.S. 593, 603, 92 S.Ct. 2694, 2700, 33 L.Ed.2d 570 (1972) (mere "subjective" expectation of entitlement not enough to afford due process protection).

### 2. *Process due*

■ Moreover, this Court notes that plaintiff has not been deprived of all process. " '[D]ue process' is a flexible concept ... the processes required by the Clause with respect to the termination of a protected interest will vary depending upon the importance attached to the interest and the particular circumstances under which the deprivation may occur." *Walters v. National Ass'n of Radiation Survivors*, 473 U.S. 305, 320, 105 S.Ct. 3180, 3189, 87 L.Ed.2d 220 (1985).

It has been frequently recognized that in certain contexts the legislative and/or regulatory process affords sufficient process to satisfy due process concerns. *See, e.g., Taylor v. District Engineer, U.S. Army Corps of Engineers*, 567 F.2d 1332, 1338 (5th Cir.1978) (owner of land was denied permit to build road on his land; court held that established regulatory procedure for reviewing permit application was sufficient to satisfy due process and a more formal hearing was not required). Importantly for this case, "[w]here the legislature enacts general legislation eliminating statutory rights or otherwise adjusting the benefits and burdens of economic life, in the absence of any substantive constitutional infirmity, 'the legislative determination provides all the process that is due.' " *Hoffman v. City of Warwick*, 909 F.2d 608, 619–20 (1st Cir.1990) (*quoting Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 433, 102 S.Ct. 1148, 1156, 71 L.Ed.2d 265 (1982)); *see Atkins v. Parker*, 472 U.S. 115, 129–30,

---

**12.** In the *LeBauve* case the court held that "even though the state has proprietary and regulatory interests in wildlife, plaintiff's interests in exercising his fishing license and using his parapher-nalia (sic) constitute legitimate claims of entitlement within the ambit of 'property rights' under the Due Process Clause of the Fourteenth Amendment." *LeBauve*, 444 F.Supp. at 1378–79.

105 S.Ct. 2520, 2528–29, 86 L.Ed.2d 81 (1985); *Jackson Court Condominiums v. City of New Orleans,* 874 F.2d 1070, 1074–76 (5th Cir.1989).

By enacting a general ban on gill net fishing the Indiana General Assembly adjusted the burdens and benefits of economic life to the detriment of the Burns Harbor Fish Company and other Indiana commercial fishing operations. The only procedural protection due these commercial fishermen, therefore, was afforded by the legislative process.[13]

### C. *Substantive Due Process*

■ Plaintiff's final claim is that Ind. Code §§ 14-2-7-11(d) and (e) violate substantive due process because the ban on gill net fishing is arbitrary and capricious, the law does not bear a reasonable relation to the goals of promoting the stated purposes and less restrictive alternatives to a total ban exist. While the plaintiff makes numerous policy arguments about why the total prohibition on gill netting is inappropriate, the State's use of its police power to enact and enforce the prohibition on gill net fishing violates substantive due process only if it is not rationally related to a legitimate purpose. *See Pennell v. City of San Jose,* 485 U.S. 1, 11, 108 S.Ct. 849, 857, 99 L.Ed.2d 1 (1988) (state price control regulation violates substantive due process only if it is "arbitrary, discriminatory, or demonstrably irrelevant to the policy the legislature is free to adopt"); *Smithfield Concerned Citizens for Fair Zoning v.*

*Town of Smithfield,* 907 F.2d 239, 244 (1st Cir.1990) ("A land use regulation will … stand if a rational relationship exists between it and a legitimate governmental objective"); *Jackson Court,* 874 F.2d at 1077–79 (legislative decision has rational basis if the question is "at least debatable").

The purpose of the ban on gill net fishing as explained by the DNR in the *Ridenour* case was to eliminate the "waste" of a public resource, i.e., the killing of salmon and trout by commercial fishermen to the detriment of the sport fishing industry. Thus, the DNR's ban was motivated by the twin goals of (1) conserving salmon and trout—which the DNR considers a scarce public resource—and (2) favoring sport fishermen over commercial fishermen by inhibiting the ability of commercial fishermen to catch salmon and trout.

■ It is clear that a state may regulate the commercial exploitation of its wildlife resources as a valid exercise of its police power. *See Baldwin v. Montana Fish and Game Comm'n,* 436 U.S. 371, 386, 392, 98 S.Ct. 1852, 1861, 1864, 56 L.Ed.2d 354 (1978); *United States v. Eberhardt,* 789 F.2d 1354, 1362 (9th Cir.1986); *White Mountain Apache Tribe v. State of Arizona,* 649 F.2d 1274, 1283 (9th Cir.1981); *see also Hughes,* 441 U.S. at 342, 99 S.Ct. at 1739 (Rehnquist J., dissenting).[14] Moreover, when regulating those resources the state may validly prohibit all use of a particular resource in order to pursue goals of conservation or resource allocation.[15] *See,*

---

**13.** In addition, this Court notes that by accepting fishing licenses which conditioned the privilege of fishing upon the condition that the legislature could limit the type of equipment that the plaintiff could use to catch fish the plaintiff impliedly agreed that it was entitled to no more process than that available through the legislative process. *See Philly's,* 732 F.2d at 90 (grant of license may be conditioned "on the acceptance of something less than the full range of possible procedural safeguards").

**14.** In *Hughes* Justice Rehnquist noted that a state has a "substantial interest in *preserving* and *regulating* the exploitation of the fish and game and other natural resources within its boundaries for the benefit of its citizens." *Hughes,* 441 U.S. at 342, 99 S.Ct. at 1739 (emphasis added).

**15.** Relying on *City of Muncie v. Pizza Hut of Muncie, Inc.,* 171 Ind.App. 397, 357 N.E.2d 735 (1976), plaintiff argues that the goal of promoting sport fishing (what might be characterized as the allocation of salmon to sport fishermen) is not a legitimate public purpose if it hurts plaintiff's livelihood. In the *City of Muncie* case the Indiana Court of Appeals affirmed an injunction against Muncie's erection of barricades to cut off vehicular traffic between plaintiff's property and a main street because of complaints from a few private citizens. The *City of Muncie* court found that Muncie's "police action" was not for the benefit of society at large and that "[p]olice power should not be used for the benefit of a relatively small group in the guise of benefitting the public." *Id.* 357 N.E.2d at 737. The gill fishing ban, however, is distinguishable from the limited ban on traffic in-

*e.g., United States v. Williams,* 898 F.2d 727, 728 (9th Cir.1990) (discussing Montana and Idaho laws which "make it illegal to sell, possess or transport certain protected categories of game animals, including moose"); *Lansden v. Hart,* 168 F.2d 409, 412 (7th Cir.1948) (upholding prohibition on killing wild geese in an area adjacent to Illinois wildlife preserve), *cert. denied,* 335 U.S. 858, 69 S.Ct. 132, 93 L.Ed. 405 (1948); *see also Hughes,* 441 U.S. at 342–43, 99 S.Ct. at 1739–40 ("the State is accorded wide latitude in fashioning regulations appropriate for protection of its wildlife. Unless the regulation directly conflicts with a federal statute or treaty ... allocates access in a manner that violates the Fourteenth Amendment ... or represents a naked attempt to discriminate against out-of-state enterprises in favor of in-state businesses unrelated to any purpose of conservation ... the State's special interest in preserving its wildlife should prevail") (citations omitted) (Rehnquist, J., dissenting). Thus, the dual aims of conservation and resource allocation, advanced by the DNR to justify the challenged gill netting ban in this case, survive scrutiny under substantive due process as legitimate motives for the use of the state's police power to regulate a natural resource.[16]

The DNR's original estimate of salmon and trout killed by gill netting was more than 76,000 fish in a 47 day period. In subsequent litigation, however, the Boone Circuit Court found that only about 6,000 salmon and trout were put at risk by gill net fishing during that 47 day period. Plaintiff contends that the significant disparity between the amount of salmon and trout originally thought to be killed by gill netting and later lower estimates of the total detriment to the salmon and trout populations reflect that the ban is not rationally related to the purposes of protecting salmon and trout and advancing sport fishing.

Large numbers of salmon and trout need not be killed, however, for the DNR to be properly concerned about their destruction. If a state may ban all use of a resource it follows that the state should be able to restrict use of a resource in any degree the state deems appropriate to pursue legitimate goals.[17] Moreover, as a logical corollary of its power to regulate and protect its environmental assets, a state should be able to take preemptive measures to protect its natural resources even before those resources appear threatened with extinction or before the State incurs significant costs in maintaining or rehabilitating the resource.[18]

Burns Harbor does not contest the assertion that some salmon and trout are unavoidably caught in its gill nets. Moreover, numerous studies made by the DNR and others support this position. Thus, the con-

---

volved in *City of Muncie* because the public in general is free to engage in sport fishing and will benefit from the preservation of sport fish. Moreover, when government is using its power to pursue its conservation function it is presumed that the public at large will benefit.

**16.** Of course, regulations favoring sport fishing cannot survive if they offend other provisions of the constitution, such as the commerce clause or the privileges and immunities clause. While plaintiff cites cases that were struck down as violative of these constitutional provisions, *see, e.g., Hughes v. Oklahoma,* 441 U.S. 322, 99 S.Ct. 1727, 60 L.Ed.2d 250 (1979) (discussing commerce clause); *Toomer v. Witsell,* 334 U.S. 385, 68 S.Ct. 1156, 92 L.Ed. 1460 (1948) (discussing privileges and immunities clause), Burns Harbor has not alleged that the gill net fishing ban is discriminatory in violation of the commerce clause, the privileges and immunities clause or equal protection under the fourteenth amendment.

**17.** This Court does not adopt the Boone Circuit Court's finding that the destruction of slightly more than 6,000 salmon and trout in a 47 day period is insignificant and without environmental ramifications. A determination regarding the environmental impact of the destruction of a particular number of fish is not necessary for this Court's ruling upon defendant's motion for summary judgment and may be left to the experts at the Indiana Department of Natural Resources.

**18.** In addition, even if the Indiana General Assembly relied upon erroneous information when enacting the gill net ban, that fact would not "transform" the Indiana General Assembly's otherwise "rational decision into an irrational one." *Harding v. County of Door,* 870 F.2d 430, 432 (7th Cir.1989), *cert. denied,* 493 U.S. 853, 110 S.Ct. 154, 107 L.Ed.2d 112 (1989).

clusion is irrefutable that some salmon and trout will be killed if plaintiff and other commercial fishermen are permitted to use gill nets. Accordingly, the gill net ban is rationally related to the legitimate goal of conserving salmon and trout. If gill nets are prohibited fewer salmon and trout will be killed by commercial fishermen. The possibility that the amount of salmon and trout that will be saved might appear to be de minimis is irrelevant.

Accordingly, for the reasons set forth in this entry, this Court concludes that enactment and enforcement of Indiana's ban on gill net fishing in the Indiana waters of Lake Michigan does not violate substantive or procedural due process and does not constitute a taking of property for which just compensation is required. Defendants' motion for summary judgment will be GRANTED. Plaintiff's cause of action shall be dismissed by separate written order. Plaintiff shall take nothing by way of its complaint.

ALL OF WHICH IS ORDERED.